

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00006-CR

_____

TIMOTEO JESUS GARZA, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CR-17-26172

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

Timoteo Jesus Garza, Jr., was convicted by a Fannin County jury of two counts of aggravated sexual assault of a child.[1]  In the case appealed here,[2] Garza was sentenced, after enhancement, to life imprisonment without parole, with the sentences to run concurrently.  In a consolidated brief addressing both cases, Garza contends that the trial court erred in (1) excluding evidence relevant to his defense of alternative perpetrator and (2) admitting evidence of four extraneous offenses in the guilt/innocence phase of his trial.  Because we find that the trial court did not abuse its discretion in these evidentiary rulings, we will affirm the judgment of the trial court.

## I.      Background

The child involved in this case was Garza's great-grandson, G.G.,[3] who was five years old at the time of the assault.  The child involved in the companion case, C.V., was six years old and was visiting Garza's home at the time of the assault.  G.G.'s mother, Lacy,[4] testified that Garza was living with Lacy's mother, whom G.G. called Nana, in a house in Windom during the late summer of 2016 and through Labor Day of that year.  G.G. began living with Garza and Nana in June or July of that year, first in a house in Edhube, and later in Windom.

---

[1]*See* TEX. PENAL CODE ANN. § 22.021(a)(2)(B), (f)(1) (West Supp.2017).

[2]In a case arising from a separate incident, and tried with this case, Garza was convicted of another count of aggravated sexual assault of a child.  That case has also been appealed to this Court and is addressed in a separate opinion released the same date as this opinion in our cause number 06-18-00007-CR.

[3]All persons who were minors at the time of the offenses referenced in this opinion will be referred to by their initials. TEX. R. APP. P. 9.10.

[4]The minor's family members are referred to by pseudonyms.

G.G. testified that, on one night while he was living with Garza and Nana, Nana was at a friend's house and G.G. was sleeping in Nana's bed in her room. He testified that Garza came in the room, pulled his shorts down, and put his penis, which G.G. called his weeny, inside his buttocks, which G.G. called his bobo or his booty. G.G. said that it felt bad and that Garza stopped and left the room when Nana returned home. G.G. said the first person he told about the incident was Miss Kassi at counseling.

Kassi Lightfoot, the program director at the Fannin County Children's Advocacy Center (the CAC), testified that she interviewed G.G. on February 2 and February 15, 2017. Her testimony regarding what G.G. told her about the incident with Garza was consistent with G.G.'s trial testimony. Lightfoot also interviewed C.V. on September 7, 2016. She testified that both children were able to communicate with her and answer her questions.

C.V. testified that Garza touched her at Nana's house when she was six years old. She testified that she and her brother, W.V., were asleep on the couch in the living room and that it was dark outside. She said that she woke up and Garza was touching her vagina, which she called her bobo. She also said that she was wearing shorts and a t-shirt, that Garza had his hand between her bobo under her clothes, and that his fingers were inside her bobo. C.V. testified that it hurt and that she wanted to go to sleep that night because she had to go to church the next morning. Garza had candy that he was trying to give her. The first person she told about the incident was her mother, Terri. C.V. testified that, although other people were at the house, they were either outside or asleep in their rooms, and that that was the only time she had been at Garza's and Nana's house.

3

Terri testified that, on Labor Day weekend in 2016, C.V.'s father, Tommy, was living at Nana's house in Windom with Lacy. She said that Tommy picked up C.V. and W.V. for visitation that weekend on Friday evening and that she picked them up at Nana's house on Monday evening. Terri testified that, when they got home on Monday evening, C.V. told her that Garza had messed with her bobo. Terri called Tommy immediately to let him know, then called the sheriff's department. She testified that C.V. had been interviewed at the CAC and that she took C.V. to Baylor Medical Center for an examination by a sexual assault nurse examiner (SANE).

Tommy also testified. His testimony was generally consistent with Lacy's and Terri's testimony regarding the events occurring on Labor Day weekend. He also testified that, when he got up on Sunday morning, he saw an open bag of candy on the kitchen table and that C.V. clung to him more than usual.

Vanessa Losada, a registered nurse and a SANE, testified that she performed a SANE examination on C.V. on September 7, 2016. Losada read the statement that C.V. gave her regarding the assault, which was generally consistent with C.V.'s trial testimony.

The State also offered the testimony of four other witnesses who had been assaulted by Garza. The first, A.K., is Garza's great-granddaughter and was nine years old at the time of trial. Before her testimony, the trial court held a hearing pursuant to Article 38.37 of the Texas Code of Criminal Procedure to determine the admissibility of her testimony (a 38.37 hearing).[5]

At the hearing, A.K. testified that, when she was seven or eight years old, she was asleep on the couch in the living room of her house and that she was awakened when Garza got on the

---

[5]*See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2-a (West 2018).

4

couch. She said that Garza touched her vagina, which she called her "taco," underneath her clothes and moved his hand back and forth. When she tried to get up, he pushed her down twice, and he only stopped when she kicked him off of the couch. A.K. testified that, at the time, her mom and dad were in their room and that her brothers and Nana were in her brothers' room. A.K. thought that this incident happened about one year before the trial.

At the conclusion of the hearing, Garza objected to the testimony under Rule 403 and argued that the probative value of the evidence was substantially outweighed by the prejudicial effect. He also objected under the right to a fair trial under the Texas and United States Constitutions. The trial court allowed the testimony to be presented, and A.K. gave substantially the same testimony at trial.

C.G., who was thirty-three years old at the time of trial, is Garza's niece. Before her testimony, the trial court held a 38.37 hearing. At the hearing, C.G. testified that, when she was between the ages of five and seven years old, she and a group of children were asleep on the living room floor of her house. She awoke with Garza hovering over her, touching and rubbing her vagina on the skin. When someone went to the restroom and the light shined into the room, Garza rolled over and pretended to be asleep. C.G. testified that a few weeks later she told Garza's wife about the incident and that the next day her father gave her a spanking and told her never to lie about his brother.

C.G. also testified that, when she was ten or eleven years old, she, her siblings, and her cousins were outside playing at her house. Garza, who was the only adult at the house at the time, called her to come inside. When she went inside, he was behind a couch and told her to come to

5

him. When she did so, Garza told her to take off her clothes, but before she could do so, he put his hand up her shorts and began rubbing her vagina on the skin. Her older cousin ran into the house and told her to come outside, and she ran outside with him. C.G., her sister, and her cousin reported the incident to a teacher, but the school called her grandparents. They got spankings and were made to go to some office and say that they had lied about Garza.

At the conclusion of the hearing, Garza objected under Rule 403 "as with the previous witness" and asked the trial court to exclude the testimony due to a lack of adequate notice "and the remoteness under [Rule] 403." The trial court allowed the testimony, and C.G. gave substantially the same testimony at trial.

The State then called A.G., who was Garza's twenty-six-year-old granddaughter. A 38.37 hearing was also held before her testimony. At the hearing, A.G. testified that, when she was a young child, she and her sister, D.G., lived with Garza and her grandmother, Mary. She testified that, when she was seven years old, and during periods when Mary was gone, Garza would bribe her with candy so he could touch her vagina with his hands and his penis. This occurred both in the bathroom and his bedroom. The last time he touched her was when she was twelve.

A.G. testified that he would touch her with both his hands and his penis on both the inside and outside. She also described times Garza would do the same thing with D.G. A.G. also testified that Garza threatened to spank them if they told anyone and that they were scared. When she was twelve, A.G. told Mary what had been happening. She testified that Mary confronted Garza about it and that he admitted that it was true. She also testified that law enforcement got involved, which resulted in a conviction.

6

At the close of this hearing, Garza made "the same objections under 403" and also objected to inadequate notice by the State. The trial court allowed the testimony, and A.G.'s testimony at trial was substantially the same.

The State also called N.B. (f/k/a D.G.),[6] A.G.'s twenty-seven-year-old sister. A 38.37 hearing was held before her testimony. At the hearing, N.B. testified that she began living with Garza and Mary when she was six or seven years old. She could not remember the first time Garza touched her sexually, but the last time was before they were removed from the home.

N.B. testified that the first time Garza touched her was on the bed in his room and that he touched her vagina with his penis. Garza would lure them into his room by asking them if they wanted candy, which he kept in a drawer in his bedroom. She testified that Garza did this to her a lot and that she heard him do the same to A.G. Mary was always away from the house when this happened. The assaults stopped after they told Mary and she kicked Garza out of the house.

At the close of this hearing, Garza stated that he "would make the same objections as the previous witness under 403." The trial court allowed the testimony, and N.B. gave substantially the same testimony at trial.

The State also offered the testimony of Jeanette Connors and Bill Kennedy, investigators for the Fannin County Sheriff's Department, who testified regarding their investigations of the assaults on G.G. and C.V., respectively. Garza offered the testimony of Jim Froelich, D.O., and Ikenna Adugba, M.D., who testified as to Garza's physical condition when they treated him in 2005–06 and 2015, respectively. He also offered the testimony of Nana, who contradicted the

---

[6]D.G. was adopted when she was seventeen and changed her name to N.B.

7

testimony of Lacy, Tommy, and C.V. regarding the events occurring on Labor Day weekend 2016. Garza also called his grandson, Donnie, who is also the step-father of A.K. Donnie testified regarding his actions after A.K. made an outcry against Garza. Donnie also admitted that he was convicted of sexual performance by a child under fourteen in 2010.

## II.    Standard of Review

A trial court's decision to admit or exclude evidence, including its decision as to whether the danger of unfair prejudice of evidence substantially outweighs its probative value, is reviewed for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We will not reverse a trial court's ruling on the admissibility of evidence if it falls within this zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (citing *Davis v. State*, 329 S.W.3d 798, 813–14 (Tex. Crim. App. 2010); *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009)). Further, we will uphold an evidentiary ruling if it was correct under any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## III.   Discussion

### A.    No Abuse of Discretion in Admitting Evidence of Other Sexual Assaults

In his second issue, Garza complains that the trial court erred in admitting the testimony of A.K., C.G., A.G., and N.B. Garza initially argues that the testimony of each of these witnesses

8

was unfairly prejudicial because it was dissimilar to the testimony of G.G. and C.V. In addition, he argues that the testimony of C.G., A.G., and N.B. described events that were too remote in time and that the testimony of A.G. and N.B. was more graphic. Finally, Garza argues that the State only had a little need for the testimony because there were two complainants at trial.[7]

Under Article 38.37, the State may introduce evidence that the defendant has committed a separate sexual offense against another child "for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2 (West 2018). Article 38.37 requires that before such evidence is admitted, the trial court must conduct a hearing outside the presence of the jury, and it must find that the evidence will support a jury finding "that the defendant committed the separate offense beyond a reasonable doubt."[8] TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2-a. In addition, "the admission of evidence under Article 38.37 'is limited by Rule 403's balancing

---

[7]Garza also argues that the admission of the four extraneous-offense witnesses violated Rule 403, "each individually and in total." He then argues that the admission of the four extraneous-offense witnesses was "piling on" and that the sheer volume of the character evidence against him was unduly prejudicial. However, in order to preserve an argument for our review, the complaining party must make a timely objection that states "the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a). The Texas Court of Criminal Appeals has noted, "The parties, not the judge, are responsible for the correct application of evidentiary rules; in order to preserve a complaint for appeal, the complaining party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention." *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009) (citing *Reyna v. State,* 168 S.W.3d 173, 176–77 (Tex. Crim. App. 2005)). "[W]hen the context shows that a party failed to effectively communicate his argument, then the error will be deemed forfeited on appeal." *Id.* (citing *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). A review of the record shows that Garza neither argued at trial that the State was piling on in his opposition to the admission of any of this testimony nor argued that the totality of the extraneous-offense evidence was excessive. Rather, Garza's Rule 403 objections at trial were limited to the individual testimony of each witness. There was nothing in the context of his objections that would have made the trial court aware of this complaint. Therefore, we find that Garza has not preserved this argument for our review. *See id.* at 314.

[8]Garza does not complain of the trial court's findings that the evidence would support a jury finding that he committed the extraneous offenses.

9

test, which permits admission of evidence as long as its probative value is not substantially outweighed by its potential for unfair prejudice.'" *Fahrni v. State*, 473 S.W.3d 486, 492 (Tex. App.—Texarkana 2015, pet. ref'd) (quoting *Bradshaw v. State*, 466 S.W.3d 875, 882 (Tex. App.—Texarkana 2015, pet. ref'd)).

> When a trial court conducts a Rule 403 balancing test, it
>
> must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). In any given case, "these factors may well blend together." *Id.* at 642.

In challenging the remoteness of the incidents involving C.G., A.G., and N.B., Garza cites *Bachhofer v. State*, 633 S.W.2d 869 (Tex. Crim. App. [Panel Op.] 1982), which held that a four-year-old allegation of sexual abuse should have been excluded because of its remoteness and because there was no final conviction. *Id.* at 872. However, as the State points out, several of our sister courts of appeals have questioned the continued viability of *Bachhofer* on this issue and have noted that it was decided before the adoption of the Texas Rules of Evidence, which favors the admissibility of relevant evidence. *Corley v. State*, 987 S.W.2d 615, 621 (Tex. App.—Austin 1999, no pet.); *Lavarry v. State*, 936 S.W.2d 690, 695 (Tex. App.—Dallas 1996, pet. ref'd); *Gonzales v. State*, 838 S.W.2d 848, 863 (Tex. App.—Houston [1st Dist.] 1992), *pet. dism'd, improvidently granted*, 864 S.W.2d 522 (Tex. Crim. App. 1993) (per curiam). *Bachhofer* was

10

decided under common law principles "which tended to favor exclusion of evidence." *Montgomery*, 810 S.W.2d at 380–81. Under the Texas Rules of Evidence, "remoteness is not the only factor to consider when analyzing the probative value of evidence of an extraneous offense." *Fisk v. State*, 510 S.W.3d 165, 173 (Tex. App.—San Antonio 2016, no pet.) (quoting *Robisheaux v. State*, 483 S.W.3d 205, 219 (Tex. App.—Austin 2016, pet. ref'd)). Rather, "[r]emoteness in time is 'an element of the factorial analysis that courts should conduct in deciding whether to exclude evidence under Rule 403.'" *Id.* (quoting *Gaytan v. State*, 331 S.W.3d 218, 227 (Tex. App.—Austin 2011, pet. ref'd)).

As for the first factor, evidence of separate sexual offenses against children admitted under Article 38.37 is probative of a defendant's character or propensity to commit sexual assaults on children. *See Bradshaw v. State*, 466 S.W.3d 875, 883 (Tex. App.—Texarkana 2015, pet. ref'd). In addition, this evidence was probative to support G.G.'s and C.V.'s credibility, which was an issue at trial. Further, there were no third-party eyewitness to either of these assaults. "Rule 403 'should be used sparingly to exclude relevant, otherwise admissible evidence that might bear on the credibility of either the defendant or complainant in such 'he said, she said' cases [involving sexual assault].'" *Id.* at 883–84 (quoting *Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009)).

Also, each of the extraneous offenses was probative to show that Garza had a pattern of assaulting young children with whom he was in a familial or quasi-familial relationship. Because the sexual assaults against G.G. and C.V. were consistent with the pattern established by the

11

extraneous-offense evidence, this evidence was compelling to establish these victims' veracity. We conclude that this factor weighed strongly in favor of admission.

As for the second factor, Garza repeatedly challenged the veracity of G.G. and C.V. throughout the trial.[9] Since there were no eyewitnesses to either of the assaults, the State's need for the evidence was heightened. Further, by adopting Article 38.37, Section 2, the Legislature recognized that, in child sex offenses, "there is typically very little evidence to assist prosecutors with proving their cases." *Id.* at 884 (quoting Senate Comm. on Criminal Justice, Bill Analysis, Tex. S.B. 12, 83d Leg., R.S. (2013)). Nevertheless, Garza argues that the State's need for the extraneous evidence was lessened because there were two accusers, citing *Pawlak v. State*, 420 S.W.3d 807 (Tex. Crim. App. 2013).

In *Pawlak*, the Texas Court of Criminal Appeals noted that the State's need for extraneous-offense evidence was lessened because there were five complainants all alleging that the defendant had sexually assaulted them, which was the ultimate issue at trial. *Id.* at 811. However, in *Pawlak*, the complainants were all in their mid- to late teens, both at trial and when the assaults occurred. *Pawlak v. State*, No. 13-10-00535-CR, 2012 WL 3612493, at *1–3 (Tex. App.—Corpus Christi Aug. 23, 2012) (mem.op.) (not designated for publication), *judgment vacated by Pawlak*, 420 S.W.3d at 811.[10] In contrast, both G.G. and C.V. were young children, both at trial and at the time of the assaults. Although their testimony regarding the assaults was clear, because of their young

---

[9]In addition to challenging the children's veracity, Garza sought to show that their accusations were fabricated by their parents.

[10]In addition, the extraneous-offense evidence in *Pawlak* was not admitted under Article 38.37. Rather, the evidence, which consisted of 9,900 pornographic images, was admitted as rebuttal evidence to the defendant's contention that he was not sexually interested in men or boys. *Pawlak*, 420 S.W.3d at 810.

age, other aspects of their testimony may have lessened their credibility.[11]  Thus, in this case, the State's need for the evidence of other, extraneous sexual offenses against children was not lessened by the fact that there were two complainants.  We find this factor favored admission.

The inherently inflammatory and prejudicial nature of evidence of extraneous sexual offenses against children does tend to suggest a verdict on an improper basis.  *Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd).  This tendency was probably heightened by the testimony of A.G. and N.B., who testified of repeated sexual assaults over the course of several years that were more serious in scope than the charged crimes.  The trial court mitigated this somewhat by giving a limiting instruction before each of the other victims testified, and in its jury instructions, that the jury must first find Garza committed the acts beyond a reasonable doubt before it could consider the evidence for any bearing it had on relevant matters.  Nevertheless, we find the third factor weighed against admission.

The ultimate issue in this case was whether Garza had committed the sexual assaults as the State alleged.  As previously discussed, the evidence of other, extraneous sexual assaults on children with whom Garza was in a familial relationship was highly probative of this issue.  Further, the presentation of the extraneous-offense evidence did not take an inordinate amount of time.  *See Gigliobianco*, 210 S.W.3d at 641.  We find the fourth factor weighed in favor of admission.

---

[11]For instance, G.G. testified that the assault happened twenty years ago and that he told his mother about it ten years ago.

13

The fifth factor, which refers to evidence such as highly technical or scientific evidence that might mislead the jury because it is not equipped to weigh the probative force of the evidence, is not applicable in this case. *See id.*

As previously noted, the presentation of the extraneous-offense evidence did not consume an inordinate amount of time. The trial testimony of the four witnesses totaled sixty-nine pages of a reporter's record containing in excess of 700 pages.[12] Stated differently, the combined 38.37 hearings and trial testimony of the four witnesses consumed slightly more than one afternoon of a trial that lasted over three days. Only N.B.'s testimony contained evidence that was somewhat repetitive of A.G.'s testimony. On this record, we find that the sixth factor favored admission.

We find that the trial court, after balancing the Rule 403 factors, could have reasonably concluded that the probative value of A.K.'s, C.G.'s, A.G.'s, and N.B's testimony was not substantially outweighed by the danger of unfair prejudice and the other factors in the rule. Consequently, we find that the trial court did not abuse its discretion. We overrule Garza's second issue.

## B.    No Abuse of Discretion in Excluding Alternative-Perpetrator Evidence

In his first issue, Garza contends that the trial court erred in excluding alternative-perpetrator evidence, which he asserts denied him the right to present this defense in violation of the Constitution.[13] We disagree.

---

[12]The 38.37 hearings of the four witnesses consumed sixty-five pages of the reporter's record.

[13]On appeal, Garza does not state whether he complains of a violation of the United States or Texas Constitution and does not state what provision he claims was violated. At trial, he complained that the trial court's action violated his due process right to present a meaningful defense under the Sixth and Fourteenth Amendments.

At a pretrial hearing, the trial court granted the State's motion in limine and informed Garza that it would not allow him to examine witnesses regarding prior outcries alleging sexual misconduct made by the complainants against two other individuals. The trial court informed Garza that it would not allow the questions unless and until there was sufficient evidence presented outside the presence of the jury to substantiate the allegations. At trial, Garza asked the trial court for a hearing outside the presence of the jury during his examination of several witnesses in order to meet this burden.

In support of his contention that there was sufficient evidence to support his alternative perpetrator defense, Garza points to the following voir dire testimony of G.G., Lacy, and Lightfoot.[14] In his voir dire examination of G.G., after refreshing G.G.'s memory with a portion of his interview with Lightfoot, the following exchange took place:

> Q.    (By [Counsel for Garza]) Do you remember having that conversation --
>
> A.    Yeah.
>
> Q.    -- with Miss Kassi?
>
> A.    Yeah.
>
> Q.    Do you remember now telling her that [Mark[15]] had also put baby shampoo --

---

[14]Although Garza also appears to complain about not being able to question the SANE who examined G.G. regarding alternative perpetrators, at trial he acknowledged that the limine order did not allow him to do so without a hearing outside the presence of the jury. Since Garza did not make a proffer of what that testimony would have been, he has not preserved any complaint regarding its exclusion. *See Rhoten v. State*, 299 S.W.3d 349, 353 (Tex. App.— Texarkana 2009, no pet.) ("In order to preserve error regarding a trial court's decision to exclude evidence, the complaining party must comply with Rule of Evidence 103 by making an 'offer of proof' which sets forth the substance of the proffered evidence.") (citing TEX. R. EVID. 103(a)(2)).

[15]Mark is a pseudonym for G.G.'s father.

A. Yeah.

Q. -- and put his weeny --

A. Yeah.

Q. -- in your butt?

A. Yeah.

Q. Did that happen?

A. Yeah.

Q. Okay.[16]

During his voir dire examination of Lacy, the following testimony was proffered:

Q. (By [Counsel for Garza]) Ma'am, there was a CPS investigation into this case; is that correct?

A. Yes.

Q. And you were -- you [Tommie, Garza, and Mark] were the subjects of that investigation.

A. Yes.

Q. Both regarding [C.V.] and [G.G]?

A. Yes.

---

[16]After completing his voir dire examination, Garza neither requested that the trial court allow him to question G.G. on these matters in front of the jury, nor attempted to question G.G. on these matters during his subsequent cross-examination of G.G. or at any other time during the trial. No other mention was made of this voir dire testimony until after a lunch break near the end of the direct testimony of the next witness. At that time, Garza told the trial court that he "wanted to clarify [his] objection with the child" and objected to not being able to ask about the alternative perpetrators. However, in order to preserve a complaint for appellate review, the complaining party (1) must make a timely request, objection, or motion that states the grounds for the ruling that the complaining party sought from the trial court and (2) obtain a ruling on his request, objection, or motion. TEX. R. APP. P. 33.1(a). Garza never made a request to the trial court to be allowed to, nor did he attempt to, question G.G. regarding these matters in front of the jury. Further, he did not obtain a ruling from the trial court. Therefore, he has not preserved his complaint that alleges the trial court excluded this testimony.

16

. . . .

Q.    And [Mark] was investigated for sexual assault?

A.    Yes.

. . . .

Q.    You and [Tommie] were both investigated as a result of the [C.V.] outcry.  Is that not correct?  They investigated everybody in the house.

A.    I don't remember that -- I just remember [G.G.]'s -- after [G.G.] outcried.

([Counsel for Garza]):  Okay.

. . . .

Q.    . . . It expanded whenever [G.G.] made outcries because he made outcries against [Tommie] and [Mark]; is that correct?

A.    Yes.

During his voir dire examination of Lightfoot, Garza proffered the following testimony:

Q.    (By [Counsel for Garza]) Mr. -- I'm sorry, [G.G.] outcried against two other people in your interview; is that correct, as far as abuse goes; one sexual abuse, one physical abuse against a third party?

A.    Correct.

Q.    He stated that [Mark] also -- let me grab my paper so I can state it correctly.  He stated that [Mark] stuck his weeny in his butt; is that correct?

A.    He stated that [Mark] stuck his weeny in his butt.

Q.    Okay.  And he stated that [Mark] was his middle dad; is that correct?

A.    Yes.

17

Q.    And he stated that it happened in a brick house on the couch while he was sleeping and he woke up; is that correct?

A.    That's correct.[17]

This case presents several obstacles to Garza's alternative-perpetrator theory. First, we have previously noted that the alternative-perpetrator defense is generally applicable to cases in which the complainant does not know his attacker. *Ex parte Huddlestun*, 505 S.W.3d 646, 661 (Tex. App.—Texarkana 2016, pet. ref'd). In this case, G.G. knew his attacker, who was his great-grandfather, and testified that it was Garza who assaulted him and that he assaulted him during the time that G.G. was living with Garza and Nana. G.G. never alleged that he did not know who assaulted him on this occasion or that he was assaulted by a stranger. Consequently, the alternative-perpetrator defense is not applicable on this record. *See id.*

Further, for evidence of an alternative perpetrator to be admissible, the defendant "must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged 'alternative perpetrator.'" *Id.* (quoting *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002)). In addition, "[i]t is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime. Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." *Id.* (quoting *Martinez v. State*, 212 S.W.3d 411, 424 (Tex. App.—Austin

---

[17]In other voir dire testimony, not cited by Garza, Lightfoot testified that G.G. was clear that both Garza and Mark had sexually assaulted him, but on different occasions and at different times.

2006, pet. ref'd) (quoting *Michaelwicz v. State*, 186 S.W.3d 601, 617 (Tex. App.—Austin 2006, pet. ref'd))).

The evidence that Garza proffered alleging that Mark was the alternative perpetrator was both meager and speculative. G.G. alleged that Garza sexually assaulted him on the bed in Nana's room at Nana's house while he was living with Nana and Garza. Even if we consider the voir dire testimony of G.G., along with that of Lacy and Lightfoot, the testimony simply amounts to an allegation that, at some time and at some unnamed place, Mark sexually assaulted G.G. There is no evidence in the record that places Mark at Nana's house during the time that G.G. was staying there, that G.G. had any contact with Mark during that time, or that Mark, rather than Garza, committed the crime charged.

Since Garza did not produce sufficient evidence to show a nexus between Mark and the crime charged, the evidence of G.G.'s outcry against Mark was properly excluded. *See id.* at 662. Consequently, we find the trial court did not abuse its discretion in excluding the evidence. We overrule this issue.

For the reasons stated, we affirm the trial court's judgment.


Ralph K. Burgess
Justice

Date Submitted:  August 28, 2018
Date Decided:  September 18, 2018

Do Not Publish